# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN T. SHINGARA,** | : | **CIVIL ACTION NO. 1:07-CV-1252** |
| **Plaintiff** | : | (Judge Conner) |
| v. | : | |
| **MAJOR WESLEY WAUGH, ROSE POLEK, BARBARA CHRISTIE, THOMAS JAKUBIAK, JOHN SPANOS, CHARLES BRENNAN, and ADAM KISTHARDT,** | : | |
| **Defendants** | : | |

## **MEMORANDUM**

Plaintiff John T. Shingara ("Shingara"), a former employee of the Pennsylvania State Police ("PSP"), brings this action pursuant to 42 U.S.C. § 1983, which imposes civil liability upon any individual who deprives another of a constitutionally-protected right under the color of state law. This is the third federal civil rights lawsuit initiated by Shingara against the PSP, and the allegations levied in the instant complaint build upon those set forth in previous litigation. In his first lawsuit, Shingara claimed that several PSP employees conspired to transfer him to another department division and to subject him to other retaliatory employment actions because he offered testimony about an alleged malfunction of PSP radar equipment. See Shingara v. Skiles ("Shingara I"), No. 04-0621, 2007 WL 210800, at *1-4 (M.D. Pa. Jan. 24, 2007). The court granted defendants' motion for summary judgment after concluding that Shingara failed to set forth a prima facie case of First Amendment retaliation. In his second lawsuit,

Shingara alleged that several PSP employees retaliated against him for filing Shingara I. See Shingara v. Miller ("Shingara II"), Civ. A. No. 1:05-CV-1807, 2007 WL 570080 (M.D. Pa. Feb. 15, 2007). The court again granted defendants summary judgment on Shingara's claims.

In the matter *sub judice*, Shingara contends that he was subjected to further retaliatory action because he pursued claims in Shingara I and Shingara II. The defendants are Major Wesley Waugh[1] ("Waugh"), director of PSP's Bureau of Technology Services; Rose Polek ("Polek"), director of PSP's Bureau of Human Resources; Barbara Christie ("Christie"), PSP's chief counsel; Thomas Jakubiak ("Jakubiak"), an attorney under Christie's supervision; John Spanos ("Spanos"), director of customer support and interoperability for the state Office of Administration; Charles Brennan ("Brennan"), deputy secretary of the Office of Public Radio Services; and Adam Kisthardt ("Kisthardt"), a captain with PSP assigned to the Bureau of Technology Services, Harrisburg office (collectively, "defendants"). Presently before the court is defendants' motion for summary judgment. (Doc. 31.) For the reasons that follow, the motion will be granted.

---

[1] Wesley Waugh was also a named defendant in Shingara I.

## I. **Statement of Facts**[2]

The pertinent facts and circumstances underlying this suit are largely not in dispute. (See generally Docs. 34, 42.) From 1992 to 2004, Shingara worked under an individual named Kathy Skiles[3] ("Skiles") in the Technical Support Division ("TSD") of the PSP. In 2004, Shingara was transferred to the Strategic Development Division ("SDD") after an internal PSP investigation revealed that he had drafted an anonymous letter criticizing Skiles' management style. (See Doc. 34 ¶ 12; Doc. 34, Ex. C at 12; Doc. 42 ¶ 12); Shingara I, 2007 WL 210800, at *1, 3. At some point during the next two years, Shingara was transferred again, this time to the Consolidated Dispatch Center ("CDC"). (Doc. 34 ¶ 12; Doc. 42 ¶ 12.) In 2006, Shingara initiated an action with the state Civil Service Commission, complaining that his salary was inadequate and that he consistently received work assignments of poor quality.[4] (Doc. 34 ¶ 13; Doc. 42 ¶ 13.) In an attempt to address Shingara's concerns, Waugh requested that Keith Keister ("Keister"), supervisor of the CDC, provide Shingara with a first-rate assignment. (Doc. 34 ¶ 14; Doc. 42 ¶ 14.) Keister

---

[2] In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to the plaintiff, who is the nonmoving party. See infra Part II.

[3] Skiles was originally named a defendant in the above-captioned action, but was dismissed by the order of court (Doc. 20) dated April 10, 2008. (See Doc. 20.)

[4] Shingara testified that he "never did follow through with the Civil Service [Commission], other than t[o] file" his complaint. (Doc. 34, Ex. C at 15.)

3

was unable to fulfill Waugh's request, for he had no available assignments to delegate. (Doc. 34 ¶ 14; Doc. 42 ¶ 14.)

On February 12, 2007, several PSP officials convened a meeting to discuss the possibility of transferring Shingara or altering his job description in order to remedy his apparent displeasure with his current work assignment. (Doc. 34 ¶ 15; Doc. 42 ¶ 15; Doc. 42, Ex. 3 at 6.) Among those present were Waugh, Jakubiak, Keister, and Stanley Burkholder, a classification specialist from the Office of Personnel.[5] (Doc. 34 ¶¶ 16, 19; Doc. 42 ¶¶ 16, 19.) Jakubiak advised the other participants that Shingara could not legally be transferred to another PSP department absent "good solid reasons, because . . . he's civil service and covered and civil service has rules." (Doc. 34 ¶ 23; Doc. 42 ¶ 23.) Waugh insisted that Shingara not be transferred back to TDD under Skiles. (Doc. 34 ¶¶ 22, 28; Doc. 42 ¶¶ 22, 28.) It is unclear whether any resolution was reached by meeting's end.

In late February or early March 2007, Kisthardt approached Waugh and requested additional assistance with a radio project that the Bureau of Technology was undertaking in conjunction with the Governor's Office of Administration. (Doc.

---

[5] It is unclear from the record whether Christie was present at the meeting, but the undisputed evidence indicates that if she was, she "never said a word." (Doc. 34 ¶¶ 17-18; Doc. 42 ¶¶ 17-18.) Shingara claims that Polek was present at the meeting, but offers no record support for his contention. (See Doc. 43 at 3.) At the summary judgment stage, it is Shingara's burden to come forth with affirmative evidence in support of his claims, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (explaining nonmovant's burden to come forth with record evidence, beyond that which is recited in the pleadings, demonstrating that there is a genuine factual issue for trial); because he has not done so, the court finds no evidence to suggest that Polek was present at the February meeting.

4

34 ¶¶ 27, 31; Doc. 42 ¶¶ 27, 31.) Waugh assigned Shingara to the project, and Shingara commenced his new duties in mid-March 2007. (Doc. 34 ¶ 29; Doc. 42 ¶ 29.) Shingara admits that the new assignment was within his area of expertise, and that he was "happy and skeptical" when he learned of the development. (See Doc. 34 ¶¶ 33-34; Doc. 42 ¶¶ 33-34.)

On March 21, 2007, an individual named Greg Moyer ("Moyer") observed Shingara speaking with an office receptionist, Amy Roberts ("Roberts"). Moyer claims that he overheard Shingara ask Roberts whether she "would like to see a picture of my organ?"[6] (Doc. 34 ¶ 42; Doc. 42 ¶ 42.) Moyer presumed this comment was sexual in nature. (See Doc. 34, Ex. H.) Shingara also purportedly showed Moyer and another co-worker, Mark Wrightstone, multiple photographs of nude females. (Id.) Moyer relayed these observations to Theresa Nelson ("Nelson"), manager of transition in the Office of Administration, who thereafter relayed the details to Spanos. (See Doc. 34 ¶ 46; Doc. 34, Ex. G at 22-25; Doc. 42 ¶ 46.) Spanos was Roberts' supervisor. (Doc. 34 ¶¶ 47-48; Doc. 42 ¶¶ 47-48.)

---

[6] Moyer's recollection of events is reproduced in a report dated July 19, 2007, authored by Kisthardt. (See Doc. 34, Ex. H.) Moyer also provided a signed statement, which is attached to Kisthardt's report. (Id.) Shingara objects to the court's consideration of his purported comment, noting that it is "a hearsay statement and not substantiated by any independent evidence of record." (Doc. 42 ¶ 42.) Hearsay statements may not be considered at summary judgment unless capable of admission at trial. See Shelton v. Univ. of Med. & Dentistry, 223 F.3d 220, 223 n.2 (3d Cir. 2000). Moyer's assertion, which is hearsay, shall not be considered for its truth, but is nonetheless relevant and admissible for the mere fact that it was conveyed to Kisthardt, who relied upon Moyer's statement as he proceeded with the official inquiry.

Word of Moyer's allegations also reached Brennan, one of the top employees in the Office of Administration. (Doc. 34 ¶ 49.) Brennan then met with Roberts to inquire into the matter, and Roberts explained that Shingara was literally referring to a musical instrument when he mentioned his "organ." According to Roberts, Shingara had then produced a photograph of the musical instrument. (Doc. 34 ¶ 52; Doc. 42 ¶ 52.) Roberts further explained that Shingara intended no sexual innuendo, and she assured Brennan that she was not offended by the conversation. (Doc. 34 ¶ 52; Doc. 42 ¶ 52.) Shingara's immediate supervisor on the radio project, Kisthardt, also learned of the alleged incident. Kisthardt requested that Spanos speak with Roberts, for Kisthardt had no supervisory authority over Roberts. (Doc. 34 ¶ 54; Doc. 42 ¶ 54.) Spanos interviewed Roberts, and Roberts confirmed what she had already relayed to Brennan. (Doc. 34 ¶¶ 55-56; Doc. 42 ¶¶ 55-56.) In early April 2007, the PSP informed Brennan that it was initiating an investigation into Shingara's alleged behavior; as a result, the Office of Administration terminated its inquiry. (See Doc. 34 ¶ 57; Doc. 42 ¶ 57.)

On April 4, 2007, Kisthardt summoned Shingara to his office and stated that a sexual harassment charge had been filed against him. (Doc. 34 ¶ 63; Doc. 42 ¶ 63.) Kisthardt explained that the charge derived from Shingara's comments to Roberts regarding his "big organ." (Doc. 34 ¶ 64; Doc. 42 ¶ 64.) Shingara described his reaction to this information as follows:

> What had happened, and I explained to him, was Amy [Roberts] was walking around. I first found out that she was—well, I knew that she was Lieutenant Roberts, who's a friend of mine's [sic], daughter. Okay. And

6

> we were talking about our cats. And I have cats, and she has cats. So she
> was showing me all these pictures of her cats, okay, just doing this and
> doing this. And she said, do you have any of yours? I said, yeah. . . . I took
> my computer. Now, on my computer under pictures, under animals, I
> have Spud, Chunk, Fig—Figaro's my cat, black cat, just died in December.
> Okay. We're going through the pictures. One of the things I have at my
> house—and I've wanted all my life—is a Hammond B3 Organ. . . . The cat
> wouldn't let me play the organ.
>
> Whenever I turned it on, Fig would sit on the keys. He would hit
> the keys. I probably have 50 or 60 pictures of Fig Organ. In fact, they're
> labeled Fig Organ One, Fig Organ Two, Fig Organ Three, Fig Organ 19.
> . . . So she said, what's Fig Organ? I said, oh, that's my Fig Organ. Okay.
> That's Fig and the organ. . . . And I said, it wasn't big organ. It was Fig for
> Figaro. And the organ was a Hammond B3. I said, go ask Amy.

(Doc. 34, Ex. C at 27-29.) After Shingara provided his version of events, Kisthardt instructed him to return to his desk at SDD until an investigation was completed by the PSP. (Doc. 34 ¶ 67; Doc. 42 ¶ 67.)

During his investigation, Kisthardt conducted separate interviews of Moyer, Roberts, and Shingara. (Doc. 34 ¶¶ 73, 78-79; Doc. 34, Ex. H; Doc. 42 ¶¶ 73, 78-79.) Both Moyer and Roberts repeated the narratives they had previously disclosed, and each signed a witness statement under oath. (See Doc. 34, Ex. H.) Shingara also repeated his version of events, but abruptly terminated the interview when Kisthardt began to question him "about the pictures of young girls." (Doc. 34 ¶ 81; Doc. 42 ¶ 81.) Shingara took a leave of absence from the PSP the day after he was interviewed by Kisthardt in April 2007. (Doc. 34 ¶ 82; Doc. 42 ¶ 82.) He refused to be re-interviewed until July 2007. (See Doc. 34, Ex. H.)

Kisthardt's investigation continued until shortly after Shingara was re-interviewed in July 2007. (See Doc. 34, Ex. H.) When the inquiry was complete,

7

Kisthardt forwarded a report to Lieutenant Martin Henry ("Henry"), director of the Equal Employment Opportunity Office for the PSP. (Doc. 34 ¶ 84; Doc. 42 ¶ 84.) Kisthardt's report did not make a recommendation with respect to disciplinary action. (Doc. 34 ¶ 84; Doc. 42 ¶ 84.) After reviewing Kisthardt's report, however, Henry concluded that Shingara violated PSP rules of employee conduct and PSP sexual harassment policies.[7] (See Doc. 34, Ex. I.) Henry's report is dated July 30, 2007. (Id.) Approximately nine months later, Shingara formally retired from the PSP. (Doc. 34 ¶ 89; Doc. 42 ¶ 89.) He had not returned to work since taking his leave of absence in April 2007. (Doc. 34 ¶ 89; Doc. 42 ¶ 89.)

On July 10, 2007, Shingara commenced this suit by filing a complaint alleging that he was the victim of retaliation in contravention of the First Amendment. (Doc. 1.) Specifically, Shingara asserts that the investigation into his conversation with Roberts was nothing more than a retaliatory attack motivated by a desire to make reprisal for Shingara's pursuit of civil rights claims in Shingara I and Shingara II. He also appears to argue that the February 2007 meeting regarding his job description was retaliatory in nature, though it is not altogether clear how this is so. On December 22, 2008, defendants filed a motion for summary judgment on Shingara's claim. (Doc. 31.) This motion has been fully briefed and is ripe for disposition.

---

[7] It is not clear from the record whether any disciplinary action was taken against Shingara as a result of Henry's findings.

## II. Standard of Review

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(c). The burden of proof is upon the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmovant on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

## III. Discussion

Shingara brings his claim under 42 U.S.C. § 1983, a provision of the United States Code that offers private citizens a means to redress violations of federal law by state officials. See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Id. Section 1983 is not a source of substantive rights, but merely a method to vindicate the contravention of federal law by state actors. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To establish a claim under this section, the plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." Id. (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Satisfaction of these elements, however, does not guarantee recovery. Certain officials, including police officers and other state actors performing "discretionary functions," are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, --- U.S. ---, 129 S. Ct. 808, 815 (2009). This doctrine, known as "qualified immunity," provides not only a defense to liability, but "immunity from suit." Hunter v. Bryant, 502 U.S. 224, 227 (1991); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

Application of qualified immunity implicates two distinct inquiries. The first evaluates whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 129 S. Ct. 808; Curley v.

10

Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not commit a constitutional infraction, the court must dispose of the claim in defendant's favor. Saucier, 533 U.S. at 201. If the defendant committed a constitutional violation, the second inquiry assesses whether the right in question was "clearly established" at the time the defendant acted. Pearson, 129 S. Ct. at 815-16; Saucier, 533 U.S. 201-02. A right is "clearly established" if a reasonable state actor under the circumstances would have known that his or her conduct impinged upon constitutional mandates. Pearson, 129 S. Ct. at 815-16; Williams, 455 F.3d at 191. Hence, a defendant may not invoke qualified immunity if the defendant's conduct diverges from that of a reasonable state actor under the circumstances. Williams, 455 F.3d at 191. The court is not required to conduct these inquiries sequentially, Pearson, 129 S. Ct. at 820, and it may eschew difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were *clearly established* at the time the defendant acted, id.

Should the court choose to address the alleged constitutional violations, however, analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. See Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Russoli v. Salisbury Twp., 126 F. Supp. 2d 821, 838-41 (E.D. Pa. 2000); see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed

11

factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).").

In the matter *sub judice*, defendants have invoked a qualified immunity defense. Thus, proceeding under the above principles, the court will consider Shingara's § 1983 claim to determine, first, whether he has offered prima facie evidence of First Amendment retaliation and, second, whether each defendant enjoys qualified immunity.

A public employee alleging First Amendment retaliation against a public employer must establish "(1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action."[8] Lauren v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007); see also Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006). Defendants can rebut a plaintiff's claim by establishing that the action or decision alleged to be retaliatory would have occurred "even in the absence of the protected conduct." Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001); Springer v. Henry, 435 F.3d 268, 275 (3d Cir. 2006). Shingara contends that he was retaliated against for pursuing claims in Shingara I and Shingara II,

---

[8] With respect to the requisite causal connection, "the plaintiff has the initial burden of showing that his constitutionally protected conduct was a 'substantial' or 'motivating factor' in the relevant decision." Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000) (citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287(1977)).

12

and the parties do not dispute that the prosecution of these federal civil rights claims is activity protected by the First Amendment. Thus, the court will turn its attention to the second and third prongs of the analysis.

The second prong of the retaliation analysis requires Shingara to show that he suffered a retaliatory action that was of sufficient magnitude to deter a person of ordinary firmness from exercising his or her rights. Lauren, 480 F.3d at 267. According to the Third Circuit, "Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry, focusing on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*." Brennan v. Norton, 350 F.3d 399, 419 (3d. Cir. 2003) (emphasis in original) (quoting Suarez Corp. Industries v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000)). "The effect of the alleged conduct on the employee's freedom of speech 'need not be great in order to be actionable,' but it must be more than *de minimis*.'" McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006) (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)).

Shingara contends that defendants retaliated against him by (1) holding the February 2007 meeting to discuss Shingara's job description, and (2) conducting an

investigation into Shingara's comments to Roberts. With respect to the meeting,[9] Shingara argues that it "establishes a retaliatory mindset that was in existence, inferentially, insofar as it was an elaborate meeting with many attendees where direct evidence of a punitive mindset had been arrogantly and openly shared." (Doc. 43 at 13.) This argument is without merit, and the February 2007 meeting does not constitute a retaliatory act for which § 1983 liability may attach.

The February 2007 meeting was held with the intent to locate a department in need of additional assistance, in the hope that Shingara might be transferred to a position in which he would receive more fulfilling work assignments. It is undisputed that Shingara was unhappy in his role with the CDD, and that he had filed a complaint with the Civil Service Commission to highlight his displeasure. Waugh attempted to avoid a department transfer by diverting additional CDD work

---

[9] Shingara has come forth with evidence that defendants Waugh and Jakubiak were present at the February 2007 meeting, but proffers no evidence to establish that either Polek or Christie was present. See supra note 5. There is also no evidence that either Polek or Christie was involved in the PSP's subsequent inquiry into Shingara's workplace behavior. In order to state a § 1983 claim against an individual defendant, a plaintiff must show each defendant "ha[d] personal involvement in the alleged wrongdoing." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005). A defendant's personal involvement in a constitutional violation may be established via allegations of "personal direction," "actual knowledge and acquiescence," or "direct discrimination." Id.; see also Andrews v. City of Phila., 895 F.2d 1469, 1478 (3d Cir. 1990). Shingara points to no portion of the record that so much as mentions Polek's knowledge or acquiescence in any of the complained-of events. Similarly, Shingara offers no evidence to suggest either that Christie was present at the meeting, or that she knew of or directed any portion of the events. At this stage in the proceeding, it is Shingara's burden to adduce evidence that each defendant was personally involved in his purported injury, Anderson, 477 U.S. at 249-50; his failure to do so with respect to Polek and Christie is fatal and warrants summary judgment on behalf of these defendants.

assignments to Shingara, but was informed that there was simply no additional work available in that department. When Waugh learned of a department in need of assistance, he immediately reassigned Shingara and, in fact, Shingara testified that he was "happy" when he learned of this turn of events. In short, the record evidence demonstrates that Shingara was unhappy in his role with CDD; that defendants met in an attempt to rectify this situation; that Waugh reassigned Shingara to a department in need of his expertise; and that Shingara was pleased when he became aware of his reassignment. There is no basis on which to characterize this chain of events as "retaliatory."[10]

Shingara next contends that the PSP's investigation into his conversation with Roberts constitutes an action in retaliation for his pursuit of Shingara I and Shingara II, as well as his commencement of a suit with the Civil Service Commission. According to Shingara, "[t]he fact that the investigation of such an obviously innocuous happenstance persisted for 90 days or more in and of itself

---

[10] Shingara's complaint regarding the meeting largely focuses upon Waugh's statement that he "made a promise to Kathy Skiles that Shingara would not be transferred back into the unit at the Technical Support Division." (Doc. 34 ¶ 22; Doc. 42 ¶ 22; see also Doc. 43 at 12-13.) Shingara characterizes Waugh's comment as "bold and arrogant," and argues that it is "direct evidence of a punitive mindset." (Doc. 43 at 13.) Even if the attributed comment is true, Shingara suffered no harm therefrom. He was not present at the meeting and, more importantly, he was pleased with his eventual reassignment to the radio project. Liability under § 1983 requires injury, see Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000) ("Section 1983 is a tort statute. A tort statute requires injury." (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)), and Shingara does not claim that his transfer to the radio project was in any way injurious or that Waugh's comment caused any actual harm. Therefore, Waugh's comment—without more—cannot constitute the basis of Shingara's First Amendment retaliation claim.

15

supports an inference of retaliation." (Doc. 43 at 14.) As an initial matter, there is no question that the PSP's investigation was warranted. An employee with no known motivation to harm Shingara reported to defendants that Shingara was engaging in potentially inappropriate workplace behavior. Employers must investigate such allegations lest they incur liability. See, e.g., Faragher v. City of Boca Raton, 524 U.S. 775, 780 (1998) ("We hold that an employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct . . . ."). Internal investigations routinely follow complaints like those levied by Moyer, and the court finds no reason to conclude that they deter ordinary individuals from exercising their First Amendment rights. Thus, the crucial inquiry is whether the length of the investigation transformed defendants' conduct into action that was retaliatory in nature.

The court finds that the length of the PSP investigation does not transform it into a retaliatory act. Moyer informed his superiors that Shingara uttered a potentially inappropriate comment, and that he was displaying photographs of nude females to his co-workers. Although Roberts assured her superiors that she was not offended by Shingara's comment, Moyer told Kisthardt that he "felt that Roberts was definitely distressed when Shingara said, 'Do you want to see my organ?'" (Doc. 34, Ex. H.) Moyer went on to add that Roberts "was embarrassed and [Moyer] felt this was evidenced by the fact that the conversation quickly died." (Id.) Even if Moyer's perception was inaccurate, the PSP had a duty to ensure that

16

Roberts was not concealing her discomfort with Shingara's actions in an attempt to avoid further embarrassment.  Moreover, even if the double entendre was no more than an "obviously innocuous happenstance," as Shingara contends, (Doc. 43 at 14), there were also allegations that Shingara was displaying nude photographs to his co-workers, a contention which neither Roberts or Shingara had explained. Kisthardt attempted to question Shingara regarding these photographs on April 4, 2007, but Shingara terminated the interview and took a leave of absence from the PSP.  (See Doc. 34 ¶¶ 81-82; Doc. 34, Ex. H; Doc. 42 ¶¶ 81-82.)  It was not until July 6, 2007, that Shingara returned for a second interview with Kisthardt and admitted to having a photograph of a nude woman saved upon his laptop computer.  (See Doc. 34, Ex. H.)  Approximately two weeks after this interview, Kisthardt produced his investigative report, effectively ending the inquiry.

In light of the facts surrounding this matter, the court finds that the PSP investigation does not constitute retaliatory activity.  Defendants were apprised of allegations of inappropriate workplace behavior, they immediately commenced an investigation, and the mere fact that it persisted for several months' time does not transform the investigation into actionable conduct, particularly in light of the rather lengthy period in which Shingara refused to be interviewed.  Furthermore, Shingara has not provided any competent evidence that the investigation in the instant case was out of the ordinary or that it was motivated by a desire to

intimidate rather than to uncover the truth.[11]  In the absence of any record citations demonstrating impropriety in the PSP investigation, defendants cannot be subject to liability for pursuing their obligation to conduct appropriate inquiry upon notice of such claims.  Summary judgment is warranted.[12]

---

[11] The court also notes that Shingara does not address the allegation regarding the nude photographs or the PSP's responsibility to investigate this aspect of Moyer's complaint.  According to Kisthardt's report, however, the length of the PSP inquiry was attributable in part to its responsibility to follow up on the allegations concerning the photographs.  (See Doc. 34, Ex. H ¶ 9.)

[12] Shingara also claims that defendants' retaliatory conduct resulted in his constructive discharge from the PSP.  (Doc. 1 at 8.)  Because defendants did not engage in any activity which § 1983 characterizes as 'retaliation,' however, Shingara's claim is unavailing.  In his brief in opposition to defendants' motion for summary judgment, Shingara seems to invoke a constructive discharge theory rooted in Title VII.  (See Doc. 43 at 16-17 (citing Pa. State Police v. Suders, 542 U.S. 129 (2004)).  Shingara did not plead a cause of action under Title VII and may not raise a Title VII claim for the first time at summary judgment.  Protocol Elecs., Inc. v. Transolutions, Inc., No. Civ. 03-4162, 2005 WL 1106132, at *5 (D.N.J. Apr. 29, 2005); In re Cendant Corp. Derivative Action Litig., 96 F. Supp. 2d 394, 398 (D.N.J. 2000).  Thus, the court will not entertain a Title VII-based cause of action at this juncture.

**IV. Conclusion**

For the foregoing reasons, the court finds that Shingara's allegations of First Amendment retaliation are without merit. In addition, because Shingara has not stated a prima facie case that he suffered constitutional harm, the court need not address defendants' qualified immunity defense.

An appropriate order follows.

    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:      April 9, 2010

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN T. SHINGARA,** | : | CIVIL ACTION NO. 1:07-CV-1252 |
| Plaintiff | : | (Judge Conner) |
| v. | : | |
| **MAJOR WESLEY WAUGH, ROSE POLEK, BARBARA CHRISTIE, THOMAS JAKUBIAK, JOHN SPANOS, CHARLES BRENNAN, and ADAM KISTHARDT,** | : | |
| Defendants | : | |

## **ORDER**

AND NOW, this 9th day of April, 2010, upon consideration of defendants' motion (Doc. 31) for summary judgment, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The motion (Doc. 31) for summary judgment is GRANTED. See FED. R. CIV. P. 56(c).

2. The Clerk of Court is directed to enter JUDGMENT in favor of defendants and against plaintiff on all claims.

3. The Clerk of Court is directed to CLOSE this case.

    S/ Christopher C. Conner
    CHRISTOPHER C. CONNER
    United States District Judge